**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA      :

     **v.**           :          **CRIMINAL NO. 22-342**

**JEROME EDWARDS**        :

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

While in escape status, after serving a 12-year federal prison sentence for two gunpoint robberies, the defendant sexually abused four children to whom he had access and a duty of care, used his cell phone to record and photograph incidents of abuse, and surreptitiously took sexually explicit photos of a fifth child. The defendant's child victims included two three-year-old children (Minor 3 and Minor 4), both of whom he orally raped while forever memorializing the abuse by video recording and photographing himself inserting his penis into the children's mouths. The defendant also recorded and photographed himself touching and rubbing these toddlers' nude genitals and between their buttocks. After removing nine-year-old Minor 2's pajama shorts while she slept, the defendant took close-up photographs depicting the child's anus while using his hand to spread her buttocks apart. The defendant recorded more than 10 minutes of video footage depicting his seven-year-old victim (Minor 5) struggling and squirming to get away from him, while he repeatedly grabbed at her genitals over her clothing and attempted to remove her pants, under the guise of "tickling her" and "seeing a bug crawling on her." And the defendant surreptitiously photographed his six-year-old victim (Minor 1) with a focus on her genitals while she wore a swimsuit and skirt while innocently playing.

In total, the defendant produced at least 77 images and 54 videos of child sexual abuse material ("CSAM"), or child pornography, depicting these victims, which FBI recovered from

his Motorola cell phone's camera roll.

The defendant's Sentencing Guideline range in this case calls for a sentence of life imprisonment; but the statutory maximum possible sentence is 270 years' (or 3,240 months') imprisonment, so that becomes the effective guideline range. For the reasons set forth below and, subject to the representations in the Sealed Supplement to this sentencing memorandum, the government seeks a life-equivalent, guideline sentence, which the defendant has earned through his abhorrent conduct. The government also asks the Court to order restitution to the minor victims of the defendant's crimes, as further discussed herein.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors which, along with the reasons discussed in the Sealed Supplement, support the imposition of a guideline, life-equivalent sentence.

## I.    PROCEDURAL BACKGROUND

The defendant's conduct came to light on June 27, 2022, when Minor 5 (age seven) disclosed to her 11-year-old brother (hereinafter "Minor Witness 1," or "MW-1") that the defendant had touched her "private parts" while he was babysitting Minor 5, MW-1, and their

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

three-year-old brother (Minor 4).  MW-1 found a video on the defendant's cell phone of the defendant touching Minor 5 over her clothing, and he called their mother to come home from work.  After the children's mother returned home with her boyfriend, the defendant fled the family's residence and left his cell phone behind.  The mother called 911, reported the crime to Philadelphia Police ("PPD"), and turned over the defendant's Cricket Motorola cell phone to PPD officers.

PPD officers located the defendant a short distance away and, after a foot pursuit, found the defendant hiding in an alley and apprehended him.  PPD officers transported Minor 5 and her mother to the scene, where they identified the defendant.  On PPD officers' body worn camera footage, the defendant angrily called Minor 5 a "lying bitch."  After determining the defendant's identity, PPD learned that he was wanted on an outstanding U.S. Marshals warrant for absconding from a residential reentry center in February 2022, and he was arrested.  The defendant has been in federal custody since on or about June 29, 2022.

On September 29, 2022, a federal grand jury returned an indictment against the defendant, charging him with nine counts of manufacture and attempted manufacture of child pornography, in violation of 18 U.S.C. § 2251(a), (e).

On December 9, 2025, the defendant entered a guilty plea to the Indictment.  A sentencing hearing is scheduled for July 9, 2026.

## II.     FACTUAL BACKGROUND

In June of 2022, in Philadelphia, the defendant sexually abused four minor victims (Minors 2, 3, 4, and 5) to whom he had access and used his Cricket Motorola cell phone to produce images of these children engaged in sexually explicit conduct.  The defendant also used his Motorola cell phone to surreptitiously photograph a fifth minor victim (Minor 1).  The child

victims ranged in age between three and nine years old.

After the defendant was arrested on the outstanding U.S. Marshals Warrant, PPD Special Victims Unit ("SVU") began reviewing the defendant's cell phone pursuant to a state search warrant.  In addition to the videos of Minor 5, which the defendant created on June 27, 2022, the same day as his arrest, detectives observed images depicting the sexual abuse of other very young children.  SVU referred the investigation to FBI Philadelphia and turned over the defendant's cell phone to the FBI.  In reviewing the defendant's Motorola cell phone pursuant to a federal search warrant, the FBI located approximately 77 images and 54 videos of CSAM in the camera roll of the phone, all of which the defendant produced.  These included videos of Minor 5, who was involved in the initial police report, as well as images and videos of four other children, who were later identified as Minors 1, 2, 3, and 4.  The images all were created by the Motorola cell phone on dates between June 5, 2022 and June 27, 2022.  In many of the images, the defendant is identifiable through distinctive tattoos on his hands and forearm and a silver wristwatch that he regularly wore.  In some videos, the defendant is also identifiable by his voice.  Some of the images are further described below:

*Images of Minor 1:* The defendant's camera roll contained several photos depicting Minor 1 (age six) with a focus on her genitals that appeared to have been taken surreptitiously between approximately June 5, 2022 and June 11, 2022.  These photos included zoomed-in shots of the child wearing a two-piece swimsuit with the focus on her genitals and zoomed-in photos with a focus up her skirt to depict her genitals covered by her underwear.  In one of these photos, the defendant's hand is visible holding the handlebars of the child's bicycle, and he is identifiable through his tattoos and silver watch.  (Count One).

*Images of Minor 2:* The defendant's camera roll contained at least three images

depicting the sexual abuse of Minor 2 (age nine) that were taken while the child was asleep on or about June 9, 2022, between approximately 6:54 and 6:55 a.m.  The images depict close-up shots of Minor 2's buttocks with her pants pulled down and the defendant's hand spreading her buttocks to expose her anus and genitals.  (Count Two).

*Images of Minor 3*: The defendant's camera roll contained approximately 60 images depicting the sexual abuse of Minor 3 (age three), taken in three distinct incidents or series on June 18, 2022.  The first series of images, created between approximately 2:35 a.m. and 2:41 a.m., depicts the child sleeping on an air mattress with her nude buttocks exposed and the defendant's hand spreading her buttocks to expose her anus, followed by several images depicting the defendant's fingers touching her genitals.  (Count Three).

The second series of images, created between approximately 3:31 p.m. and 3:32 p.m., depicts Minor 3 awake and standing in a bathroom with her pants pulled down to expose her genitals, followed by an image depicting the defendant's hand spreading her buttocks apart to expose her anus.  (Count Four).

The third series of images, created between approximately 8:09 p.m. and 8:16 p.m., depicts Minor 3 with the defendant's penis touching her lips and tongue; the defendant's fingers touching her genitals; and the defendant's hand spreading her buttocks to expose her anus while she bends over.  (Count Five).

*Images of Minor 4*: The defendant's camera roll contained approximately 12 images and 52 videos depicting the sexual abuse of Minor 4 (age three), taken between June 25 and June 26, 2022 in three distinct incidents or series.  In some of these images and videos, the defendant's tattoos and watch are visible.  In some videos, the defendant speaks to Minor 4, and his voice is identifiable.  The first series, created between approximately 8:55 a.m. and 9:01 a.m.

on June 25, 2022, begins with images depicting the child standing nude in a bathroom touching his penis, followed by images depicting the defendant's hand grabbing his buttocks to expose his anus. Next are images depicting the defendant's hand touching Minor 4's genitals. The series includes several short videos depicting Minor 4 touching his penis, the defendant's hand rubbing Minor 4's anus and between his buttocks, the defendant's penis close to the child's mouth, and a 23-second-long video depicting the defendant's hand spreading the child's buttocks and rubbing his anus. (Count Six).

The second series, created between approximately 12:01 a.m. and 12:39 a.m. on June 26, 2022, consists of approximately 27 videos, including videos of the defendant undressing the child to expose his anus, sticking his finger between the child's buttocks, and exposing the child's penis. (Count Seven).

The third series, created between approximately 10:16 a.m. and 10:22 a.m. on June 26, 2022, contains approximately 15 videos, including videos depicting Minor 4 touching the defendant's penis while the defendant tells him to "squeeze it," "lick it one time…," and "hold it one more time," and videos depicting the defendant inserting his penis into Minor 4's mouth while telling him, "Put it in your mouth one time. Open your mouth. Don't bite." (Count Eight).

*Images of Minor 5:* The defendant's camera roll contained two videos of Minor 5 taken on June 27, 2022, when she was seven years old. The first video is approximately 9 minutes long and depicts Minor 5 sitting on a bed playing with her tablet. The adult recording the video is positioned at the foot of the bed and is identifiable as the defendant through his voice, tattoos, and watch. At various points, the video zooms in with a focus on Minor 5's genitals. After a few minutes, the defendant begins talking about a bug being on the child and slaps and grabs at her genital area. Minor 5 gets off the bed, but then returns. The camera

refocuses on her genitals while the defendant tells her that the bug is back and repeatedly grabs and rubs her stomach and genitals. The second video depicts Minor 5 laying on the same bed a short time later. Again, the defendant is identifiable through his voice, tattoos, and watch. The defendant tells Minor 5 that he is going to tickle her and then grabs at her genital area while zooming the video in to focus on her genitals. Minor 5 yells at him to stop and kicks him. The defendant tells her to spread her legs and uses his hands to spread her legs himself while focusing the camera on her genital area, and then asks if she wants money to play the "tickle game." The video ends when MW-1 arrives. (Count Nine).

### III.    SENTENCING CALCULATION

#### A.    Statutory Maximum Sentences

**Manufacture and attempted manufacture of child pornography, 18 U.S.C. § 2251(a), (e) (Counts One through Nine):** 30 years' imprisonment with a 15-year mandatory minimum term of imprisonment, a mandatory minimum 5 years of supervised release up to a lifetime of supervised release, a $250,000 fine, a $100 special assessment, mandatory restitution pursuant to 18 U.S.C. § 2259, and if found to be non-indigent, an additional mandatory $5,000 special assessment must be imposed pursuant to 18 U.S.C. § 3014, and up to $50,000 in additional assessments may be imposed pursuant 18 U.S.C. § 2259A, per count.

**TOTAL MAXIMUM PENALTY**: 270 years' imprisonment with a mandatory minimum term of 15 years' imprisonment, a minimum 5 years up to a lifetime of supervised release, a $2,250,000 fine, mandatory restitution, a $900 special assessment, and if found to be non-indigent, up to $45,000 in additional assessments under 18 U.S.C. § 3014, and up to $450,000 in additional assessments may be imposed under 18 U.S.C. § 2259A.

#### B.    Sentencing Guidelines Calculation

The government agrees with the Probation Office's calculation of the defendant's advisory Sentencing Guideline range, outlined in PSR ¶¶ 29-116. The defendant's final offense level is 46, but is limited to 43 because that is the highest level on the sentencing table. PSR ¶ 116. With a Criminal History Category III and final offense level of 43, the advisory Guideline

range is life imprisonment, but the effective Guideline range is 270 years' imprisonment, which is the statutory maximum sentence.  PSR ¶ 220.

### IV.    SENTENCING ANALYSIS

A thorough consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that a life-equivalent prison sentence is warranted.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

### A.    Consideration of the 3553(a) Factors

#### 1.    The nature and circumstances of the offense

The production of child pornography is undisputedly a grave offense.  As the Supreme Court has explained, "[c]hild pornography harms and debases the most defenseless of our citizens.  Both the State and Federal Government have sought to suppress it for many years, only

to find it proliferating through the new medium of the Internet." *United States v. Williams*, 553 U.S. 285, 307 (2008).  Congress, too, has explained the difficulties in successfully combating the "immense" problem of child pornography and the "rapidly-growing market" for such materials, which is fueled by new technologies that were largely unavailable when the Sentencing Guidelines were first promulgated. *See S. Rep. No. 108-2 (2003).*  Indeed, Congress has repeatedly expressed its dismay about the "excessive leniency" of federal sentences, *see H. Rep. No. 108-66; S. Rep. No. 104-358*, especially in light of the continuing harm caused to the children appearing in such materials, as well as the inflammatory effect it has on the "desires of child molesters, pedophiles, and child pornographers," which results in a robust and growing market for child pornography and, therefore, increased abuse of innocent children.  *See Child Pornography Prevention Act of 1996,* Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26, 27 (1996), codified at 18 U.S.C. § 2251 note; *United States v. MacEwan*, 445 F.3d 249, 250 (3d Cir. 2006); *United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998).  The Supreme Court has clearly recognized the harm to these children, noting that the "materials produced are a permanent record of the children's participation…" in the abuse.  *See New York v. Ferber*, 458 U.S. 747, 759 (1982); *Osborne v. Ohio*, 495 U.S. 103, 111 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children for years to come.").

The defendant engaged in a pattern of child sexual abuse and exploitation, which included orally raping two of the most vulnerable members of the community, recording, and photographing the rapes.  Minor 3 and Minor 4 were toddlers, incapable of understanding the nature of the defendant's actions or reporting the abuse to anyone.  At age nine, Minor 2 was also particularly vulnerable--- asleep and unaware that the defendant had removed her pajama

bottoms to sexually abuse her and take close-up photos of her anus and genitals.  At age six, Minor 1 innocently played in a swimsuit and sat down while wearing a skirt, unaware that the defendant was surreptitiously taking zoomed-in photos of her genitals.  All of the victims' parents trusted the defendant to care for and protect the child victims.  Instead, he betrayed that position of trust and repeatedly sexually abused and exploited these children.

Left alone to care for Minor 5 and her younger brother, Minor 4, the defendant attempted to turn the sexual abuse of Minor 5 into a game, sexually touching the child under the guise of tickling her and looking for a bug on her.  As depicted in the videos he recorded, for more than ten minutes, the defendant accosted the child while she squirmed and tried to get away from him. He repeatedly grabbed at and touched her genitals and tried to pull her pants down.  Fortunately, at just seven years old, Minor 5 knew this behavior was wrong and not some kind of "game."  As soon as her older brother returned home from the corner store, she told him what happened.  At just 11 years old, Minor 5's older brother also knew this behavior was wrong and immediately called his mother, who returned home to confront the defendant and called 911.

Had those children not disclosed the defendant's conduct to their mother and had she not reported the crime to police and turned over his cell phone, the defendant's sexual abuse of Minor 3, Minor 4, and Minor 2 and his surreptitious production of CSAM depicting Minor 1 may have gone undetected.  Instead, after the police report in June 2022 and law enforcement's uncovering of the extent of the defendant's heinous crimes, the defendant finally faced accountability for his abuse and exploitation of the victims, even those who were too young to tell and those were sleeping and unaware.  Meanwhile, the lives of the victims and their families changed forever.  Minor 3 and Minor 4 were too young to appreciate the wrongfulness of the defendant's conduct and too young to disclose the abuse.  Minor 2 was asleep.  Minor 1 was

unaware. Their parents and caretakers, however, learned of the defendant's abuse of the children when FBI asked them to identify their children in sanitized still images of the abuse. Those images and the knowledge of how the defendant abused their children are now seared into their memory. Someday, those children's parents will have to make the impossible choice of whether to tell the children about the sexual abuse or allow the children to move through life without knowing that their childhood sexual abuse was forever memorialized in videos and images recorded by the perpetrator.

The defendant has committed some of the very worst criminal offenses, and he has earned a life-equivalent sentence based on the nature and circumstances of the offenses.[2]

2.    The history and characteristics of the defendant

The defendant is a 55-year-old man with antisocial personality disorder who has spent most of his adult life in prison. He has no employment history, PSR ¶ 195; he does not have a high school diploma or GED; he has not taken a single educational course while detained at the Federal Detention Center on this matter, PSR ¶ 190; he has not participated in any work detail at the FDC, ¶ 192.

The defendant has been involved in the justice system since he was a juvenile, with his first criminal arrest occurring when he was just 10 years old. PSR ¶133. As an older juvenile, he was adjudicated delinquent of robbery, and placed at a juvenile detention facility for approximately two years. Since reaching adulthood, the defendant has incurred at least 10 prior criminal convictions, including multiple violent robbery convictions and convictions for

---

[2] The government expects the parents of Minor 3, Minor 4, and Minor 5 may attend the sentencing hearing, at which time they may choose to address the Court and provide victim impact testimony. Should the government receive any written victim impact statements in advance of the sentencing hearing, they will be forwarded to the Court and defense counsel.

unlawfully carrying a firearm.  PSR ¶¶ 120-129.   Throughout his lengthy criminal history, the defendant has violated **every** criminal justice sentence that included a period of probation or supervised release.  After his first adult conviction for robbery in 1989, the defendant was incarcerated until May of 1992.  PSR ¶ 120.  He violated his parole and probation multiple times by incurring new arrests and convictions, and he received new, shorter prison sentences.  *Id.* Eventually, he was sentenced to serve 2 to 4 years' imprisonment in October 1998, was denied parole, and served his maximum sentence.  PSR ¶ 122.  He was released from Pennsylvania state prison in October 2002 and, within seven months, was charged with being a felon in possession of a firearm.  PSR ¶ 127.  He was federally prosecuted in EDPA for this offense and received a sentence of 77 months.  *Id.*  As with his prior state-level criminal justice sentences, after being released from federal prison in March 2009, the defendant violated his community supervision within months and served a 3-month violation sentence.  *Id.*  Just one year after being released from the violation sentence, the defendant committed two violent gunpoint robberies of two fast food restaurants in the Germantown and West Oak Lane neighborhoods of Philadelphia.  PSR ¶ 129.  He was federally prosecuted for these offenses, convicted at trial, and sentenced to 144 months' imprisonment.  *Id.*  After incurring 23 disciplinary infractions while serving this sentence, the defendant was released to a residential reentry center ("RRC") on February 25, 2022, and, just three days later, walked out after physically assaulting a staff member, never to return.  *Id.*  With a scheduled release date of July 22, 2022, the defendant should have been at the RRC when he committed the instant offenses.  *Id.*  Instead, he sexually abused and exploited five children, adding child sex offender to his already violent and extensive criminal history.

Throughout his criminal history, the defendant has undergone several psychological evaluations.  At least as early as 2004, the defendant was diagnosed with antisocial personality

- 12 -

disorder.  PSR ¶ 174.  The defendant exhibited several characteristics associated with antisocial personality disorder, including anger, impulsiveness, irresponsibility, and difficulty conforming to social norms.  *Id.*  Unsurprisingly, Bureau of Prisons (BOP) psychologist Dr. Kristina Lloyd's 2024 evaluations of the defendant during the pendency of this case contained many of the same findings.  "Individuals with antisocial personality disorder are frequently deceitful and manipulative to gain personal profit or pleasure.  They may repeatedly lie, use an alias, con others, or malinger."  Lloyd Competency Report, p. 7.  As noted in the 2004 evaluation, individuals with longstanding antisocial behavior generally have limited treatment success.  PSR ¶ 174.  As Dr. Lloyd found and as the defendant's history demonstrates, the defendant "has a long history of law-breaking behaviors, beginning in adolescence.  He typically rationalizes his behavior and is indifferent to the ways in which his behavior has harmed others."  Lloyd Competency Report, p. 7.  The defendant demonstrates a "pervasive disregard for… the rights of others, that begins in early childhood and has continued into adulthood."  *Id.*

The government submits that the only way to protect the community from the defendant and, in particular children, is to ensure that the defendant is incarcerated, without access to children.  The defendant has demonstrated by his own conduct that he is a true sexual predator and violent offender whose criminal activity can only be stopped through incarceration.  He has earned a life-equivalent sentence.

3.   <u>The seriousness of the offense, respect for the law, and just punishment</u>

A significant term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  § 3553(a)(2).  These are grave offenses with lasting impact upon the victims.  The sentence in this case must promote respect for the laws that the defendant has broken, and must make him understand the

- 13 -

impact of his crimes.  This can only be accomplished by the imposition of a significant sentence of incarceration.  Only a life-equivalent will adequately punish this defendant, and such a sentence has been well earned.

### 4.  Deterrence

Deterrence is also one of the factors that calls for a significant sentence of incarceration. The defendant himself needs to be deterred from sexually exploiting and abusing children and committing other crimes in the future.  A life-equivalent sentence will accomplish this goal. Based on the defendant's history, a life-equivalent sentence is the only way to accomplish this goal and to protect the community from him.  Section 3553(a)(2) also mandates that the Court consider a sentence that adequately deters others who would commit similar offenses.  The sentence in this case must give notice that the sexual abuse and exploitation of children has serious and significant consequences.  A life-equivalent sentence also will serve as a deterrent to others inclined to commit these serious offenses.

### 5.  Consistency in Sentencing

The life-equivalent sentence sought by the government is consistent with sentences imposed in this District for offenders who have committed similar crimes.  In this District, defendants convicted of manufacturing child pornography typically receive sentences within or close to the recommended Guideline range.  Offenders like defendant Edwards, who engage in hands-on sexual abuse as part of their manufacturing of child pornography, often receive life-equivalent sentences.  *See, e.g., United States v. Robert Caesar*, (18-525) (Pappert, J.) (statutory maximum sentence of 100 years' imprisonment imposed for defendant who sexually abused two 14-year-old boys and manufactured child pornography of one of them); *United States v. Sandro Zhinin* (17-383) (Smith, J.) (life sentence for 33-year-old defendant who traveled to have sex

with his 11-year-old victim and recorded the abuse); *United States v. Lawrence Jamieson* (17-113-01) (Pratter, J.) (sentence of 100 years' imprisonment imposed on Guidelines of life imprisonment for offender who sexually abused his autistic teenage victim with a co-defendant, produced, and distributed images of her abuse); *United States v. Matthew Maffei* (16-511) (Goldberg, J.) (statutory maximum sentence of 90 years' imprisonment imposed on first-time offender defendant who manufactured two images of child pornography and sexually abused his 7-year old victim during the commission of his crimes); *United States v. Timothy Kalinowsky* (19-178) (Pratter, J.) (sentence of 390 months' imprisonment for first-time offender where defendant sexually abused a 12 to 13-year-old girl and manufactured three images of the abuse); *United States v. Joshua Lang and Kenneth Miller* (24-53) (Savage, J.) (sentences of 430 months' and 400 months' imprisonment, respectively, for defendants who manufactured CSAM during their hands-on abuse of a 12 to 14-year-old victim and surreptitiously produced CSAM of other children); *United States v. Luis Perez Rodriguez* (20-328) (Wolson, J.) (sentence of 120 years' imprisonment for defendant who manufactured and distributed images of 10-year-old and 3-year-old victims).  Notably, *unlike defendant Edwards,* most of these offenders were "first-time" offenders, like vast majority of child sexual exploitation offenders who are also "first-time" offenders.  *See U.S. Sentencing Commission, Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 320 (2011)* available at http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Mandatory_Minimum_Penalties/20111031_RtC_Mandatory_Minimum.cfm.  Even these first-time offenders received life-equivalent sentences.  Based on his abhorrent conduct and his extensive, violent criminal history, the defendant has earned a life-equivalent sentence.

6.   Guideline Policy Statements Issued by the Sentencing Commission

The sentence sought by the government also comports with the policy statements and studies conducted by the United States Sentencing Commission ("USSG").  In October 2021, the USSG published a report entitled Federal Sentencing of Child Pornography Production Offenses (hereinafter "Child Pornography Production Report"). *See*

www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf.  This report is a compilation of data from 2005 through 2019 for every offender convicted in the United States of the crime of production of child pornography.  Importantly, the Sentencing Commission found that in the 15-year period studied, the long-term trend shows that "[C]ourts consistently sentence child pornography production offenders to lengthy sentences."  *See Child Pornography Production Report* at 21. Indeed, in analyzing the bases for the Courts' imposition of such lengthy sentences, the Sentencing Commission recognized that "child pornography production offenses are serious crimes that memorialize the sexual abuse and exploitation of children."  *Id.* at 54.

The Child Pornography Production Report analyzed a number of cases over the 15-year study period, and determined "average" sentences imposed for production offenses.[3]  The data

---

[3] The Report found that the average sentence imposed for all production crimes was 275 months' incarceration.  *Id.* at 21-22.  Importantly, the "average" sentencing numbers are based on data that inaccurately results in "average" sentences that are actually *lower* than the true average sentence.  In calculating these averages, those defendants who received sentences of 470 months or greater (including life) were limited in the sentence average computations as just 470 months' incarceration.  *See* Child Pornography Production Report at 21, FN 35. That means that those who received sentences greater that 470 months' incarceration were capped at just 470 months (39 years), ***thus creating an inaccurate "average" sentence that is lower than the true average sentence imposed for these most egregious crimes.***

Though the Report shows that 57% of the sentences represented downward variances from the applicable sentencing Guideline range, more than 20% of that number was based on government-sponsored downward variances.  *Id.* at 22.  In other words, only a little over one-third of the cases

*continued . . .*

showed that the "average" sentence increased in length for the most egregious of production offenders. The Commission found that courts imposed longer than average sentences when various factors were present in a case, many of which are also present in defendant Edwards' case, including: the defendant victimizing toddlers; the defendant having a close or familial relationship to the victims; the defendant having sexual contact with the children during the offense; the defendant maintaining a position of trust; and the defendant's pattern of sexual exploitation of children. *Id.*

In short, the defendant's conduct is far more egregious than the "average" child exploitation offender—he orally raped and otherwise sexually abused and exploited two toddlers, sexually abused a nine-year-old in her sleep, sexually abused a seven-year-old, and exploited a six-year-old. He committed these offenses while in escape status, after being convicted of several felony offenses and spending most of his adult life in prison. The defendant has earned a life-equivalent sentence.

### 7. Other considerations

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner… ." § 3553(a)(2)(D). The defendant can and should receive sex

---

involved downward variances granted by the Court without the prosecutor's motion. A recent study ordered in this district revealed similar results for the EDPA: downward variances were imposed in only 36% of the cases on the Court's own motion. The majority of the EDPA sentences for § 2251 offenses remain within the calculated Guideline ranges. In a significant number of the EDPA cases, a sentence of life or life-equivalent incarceration was imposed, even when the offender had pleaded guilty and had no prior criminal history.

As noted above, for many of these offenders, the calculated Guideline range is life imprisonment, so that even a sentence that represents a "downward variance" still results in decades in prison.

offender treatment while serving his federal prison sentence.

        8.   <u>Restitution and Financial Penalties</u>

        A.  <u>Restitution</u>

The government requests that the Court order at least $3,000 in restitution to each of Minors 1, 2, 3, 4, and 5.  *See* PSR ¶ 216.  The government has not received any additional claims.  Title 18, United States Code, Sections 2259(a) and (b)(4) mandate restitution for losses suffered by victims of child sexual exploitation.  Under § 2259, restitution covers "the full amount of the victim's losses."  § 2259(b)(1), (3).  A court may not decline to order restitution because of the defendant's economic circumstances or "the fact that the victim has, or is entitled to, receive compensation" from another source.  § 2259(b)(4)(B).

        B.  <u>Other Financial Penalties</u>

The defendant is subject to the Justice for Victims of Trafficking Act (JVTA), and to the provisions of the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 (AVAA).  Based on the defendant's financial information as documented in the pre-sentence report, the government agrees that he is indigent for the purposes of these assessments.

## V.    CONCLUSION

For the reasons set forth above and in the sealed supplement to this memorandum, the appropriate considerations of sentencing favor the imposition of a life-equivalent sentence.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Kelly Harrell*
KELLY HARRELL
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I caused a true and correct copy of the foregoing

Government's Sentencing Memorandum to be served by email upon counsel for defendant:

Mark Wilson, Esq.
Mark_Wilson@fd.org


*/s/ Kelly Harrell*
KELLY HARRELL
Assistant United States Attorney


Date: July 2, 2026